## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **BRADLEY KOCSIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 14-2167-CM** |
| **COUNTY OF SEDGWICK, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Plaintiff Bradley Kocsis brings this action against defendants Robert Hinshaw, the Sedgwick County Sheriff during plaintiff's incarceration at the Sedgwick County Detention Center (the "Jail"); Sedgwick County, Kansas ("Sedgwick County"); and defendant David E. Kendall, a detention deputy at the Jail at the time of the incidents at issue. Plaintiff brings claims against all defendants pursuant to 42 U.S.C. § 1983; claims under the Kansas Tort Claims Act ("KTCA") against all defendants; and a claim under the KTCA for the tort of outrage against Kendall only. Before the court is defendants Hinshaw's and Sedgwick County's Motion for Summary Judgment (Doc. 111).

## I. Legal Standards

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine" factual dispute requires more than a mere scintilla of evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In making the summary judgment determination, the court must view the evidence and reasonable inferences in the light most favorable to the nonmoving party. *Adler v. Wal-*

*Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  However, the nonmoving party may not rest on the pleadings but must set forth specific facts.  *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).  Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  *Liberty Lobby*, 477 U.S. at 252.

## II.  Evidentiary Concerns

### A.    Hearsay Statements Contained Within Unchallenged Reports

Defendants object to a number of statements plaintiff attempts to enter into evidence which are contained in unchallenged investigative reports.  Defendants argue that the underlying statements are hearsay if used to prove the matter asserted.  If plaintiff intends to use a hearsay statement for the truth of the matter asserted, plaintiff has the burden to show the statement falls under a hearsay exception.  *See Garcia-Martinez v. City & Cty. of Denver*, 392 F.3d 1187, 1191 (10th Cir. 2004) (observing that the proponent bears the burden of demonstrating that a hearsay exception applies).  Plaintiff made no such attempts, and the reports are not accompanied by a sworn affidavit.  In these instances, unless a hearsay exception clearly applies, the court only considers the statements for non-hearsay purposes, not for the truth of the matter.

### B.    Requested "Favorable Inferences"

Plaintiff makes a number of requests that the court make favorable inferences based on a lack of evidence in the record.  In most cases, it would not be appropriate to do so because plaintiff has the burden of proof on both his § 1983 claims and his negligence claims and refers to a lack of evidence to support his claims, as discussed below.

### 1.  Reporting Discrepancies

Plaintiff refers to what he calls "reporting discrepancies" and requests that the court make inferences favorable to plaintiff in construing the facts.  Plaintiff refers first to a report prepared by Lieutenant David E. Milam, who directly reported to Captain Jared Schechter. The report appears to have been prepared in 2015.  Plaintiff also provides Prison Rape Elimination Act ("PREA") Surveys, which Sedgwick County Detention Center filled out annually to report instances of sexual misconduct to the Department of Justice.  Plaintiff cites to discrepancies between the numbers reported to the Department of Justice and numbers reported by the Sheriff's Office's Professional Standards Unit ("PSU").  It is not clear from the record or plaintiff's briefing to what or to whom PSU was reporting. The purpose for comparing the two sets of data is not clear from Schechter's deposition, other than to perform some kind of internal audit regarding sexual misconduct reporting data.

Plaintiff suggests the discrepancies are evidence defendants withheld reports and requests an adverse inference.  Plaintiff did not move to compel any discovery, and defendants state that they produced all relevant reports after a reasonable search.  Plaintiff does not suggest what reports are missing.  Defendants state that the overall numbers of substantiated complaints is consistent, therefore there is no genuine issue of material fact.  Without more, the evidence does not support an inference that defendants purposefully withheld any investigative reports or that any such reports ever existed.

### 2.  Hinshaw's "Inaction"

Lieutenant Reed, an employee of the Jail, testified at his deposition that he did not recall Hinshaw

- personally conducting any instruction from 2009 to 2012 on proposed PREA standards;

- saying he wanted to gather personnel to study incidents to try to learn from them and prevent them in the future;

- saying that he was concerned that unanswered inmate request forms were found in Evans's inbox;

- expressing concern about a substantiated allegation that Deputy Sauer intentionally withheld information regarding an inmate's complaint;

- expressing a concern regarding the matter of non-reporting by deputies on claims of sexual misconduct;

- sending out some request that he wanted to chart trends and patterns on whether sexual misconduct was taking place;

- requesting that somebody analyze trends or types of complaints and hours of day "and that sort of thing;"[1]

- saying he was changing something about the way professional visitation would be allowed or monitored;

- saying or writing that too many deputies were withholding information; or

- calling a meeting after any incident and expressing the view that something needed to change afterwards.

Plaintiff asks the court to infer that because Reed did not recall Hinshaw discussing these topics with him, he must not have done so, or he must have been indifferent to the topics. Reed, however, did not testify that Hinshaw, the sheriff, would have had any reason to speak with him, a lieutenant, about any of the above topics. Therefore, the court will not infer Hinshaw was indifferent to the topics or did not discuss them with anyone.

---

[1] (Doc. 121 at 51 ¶ 77.)

### III.  Facts

The following facts are uncontroverted or construed in the light most favorable to the plaintiff, unless otherwise noted.[2]

### A.  The Parties

This case involves an alleged sexual assault and rape of plaintiff Bradley Kocsis at the Jail by former detention deputy David Kendall.  The Sedgwick County sheriff operates the Jail and employs detention officers.  The Sedgwick County sheriff is an elected position.  Defendant Hinshaw was the sheriff from December 2008 until he retired and left that position in December 2012.  As the sheriff, Hinshaw served at the top of the hierarchy for the Sedgwick County Adult Detention Facility.  As such, Hinshaw was involved in the management of the staff and inmates, particularly the drafting, revision, approval, issuance, and enforcement of policies, procedures, rules, guidelines, practices, and customs.  Hinshaw was also responsible for the hiring, firing, discipline, training, and supervision of jail guards and other staff.

From July 13, 2010 until September 4, 2013, plaintiff was an inmate at the Jail under the control and custody of Hinshaw.[3]  He was housed within the Jail in POD 2 from April 13 to 15, 2012.  Plaintiff alleges Kendall raped plaintiff early in the morning on April 15, 2012 at the Jail in POD 2, cell 208.  Kocsis also alleges Kendall had sexually assaulted him in the same POD and cell on April 14, 2012, but he claims no physical injury from the alleged April 14 incident.

Hinshaw hired defendant Kendall as a detention deputy in October of 2008.  Kendall passed background investigations, including a psychological exam, before he was hired.  In 2009, Kendall

---

[2] The court does not include immaterial facts, except for context or to explain why they are immaterial.
[3] After September, plaintiff was transferred to the Kansas Department of Corrections and was housed at one of the state's prisons.  Since that time, plaintiff's sentence on pending criminal charges against him was reversed for resentencing, plaintiff withdrew his guilty pleas, and he is now free on bond awaiting trial of the charges against him.

successfully completed formal training, which consisted of eleven-week formal academy instruction and a six-week field training program.  Detention deputies, including Kendall, were required and paid to attend continuing education and training yearly.  Kendall attended in-house continuing training sessions while employed by Hinshaw.[4]  Kendall's formal job performance reviews with the sheriff overall were in the satisfactory range.[5]  Kendall's last evaluation was on or about October 20, 2011.

## B.  The Jail

At relevant times, inmates at the Jail were housed in several different PODs within the Jail, which provided different levels of security.  In April of 2012, Hinshaw employed approximately 330 detention staff, including detention deputies for the daily operation of the Jail.  The monthly average inmate population at the Jail was approximately 1,060 in 2012.  However, in 2012, the total number of inmate bookings into the Jail was approximately 28,000.

---

[4] Plaintiff admits that Kendall received training during the time he was employed by the Sedgwick County Sheriff's Department.  He offers evidence showing that Kendall received 30.5 hours of training in 2010, 33 hours in 2011, and 8 hours through June 27, 2012.

[5] Plaintiff attempts to controvert the fact of Kendall's satisfactory performance reviews with the following "less than satisfactory" aspects of Kendall's work history at the Jail:

- A May 25, 2009 employee evaluation indicated an altercation in his assigned area in POD 22.
- A September 24, 2009 written letter of counseling for Kendall's failure to return his performance review for two weeks despite four separate requests by a superior.
- A November 16, 2009 letter of counseling for failing to sign the pod's housing locator.
- A January 17, 2010 written letter of reprimand for receiving and losing an inmate's money order.  A one-year "reckoning period" was imposed.
- A June 18, 2010 written letter of reprimand for receiving and losing a money order intended for an inmate.  An additional one-year "reckoning period" was imposed.
- An October 10, 2010 employee evaluation reported that Kendall "occasionally has issues with authority and did receive a reprimand with reckoning period ending June 18, 2011 for insubordination."  Kendall's supervisor suggested that "Kendall work on his issues with authority; be willing to listen to his supervisor . . . ." (Doc. 121 at 36 ¶ 40.)
- An October 27, 2011 employee evaluation reporting that it took Kendall "a couple of years to properly catch onto our expectations . . . ." (*Id.*)
- A May 29, 2012 counseling memorandum for excessive absenteeism noting that Kendall had "established a clear pattern in calling in sick for duty[.]" (*Id.*)

Despite these infractions, Kendall received "satisfactory" reviews on a spectrum ranging from inadequate to exceptional.  Because the individual instances listed above would not put Sedgwick County on notice that Kendall would sexually assault an inmate, they are not material.

### C. Written Policies and Training

Written policies in place while Hinshaw was sheriff concerning the various responsibilities of Sedgwick County sheriff and employees of the Sedgwick County Sheriff's Department ("Sheriff's Office") included General Order  101.00, which outlined the philosophy and operational goals of the sheriff as follows:

> A.  Philosophy
> 1.   To keep the facility secure and to safeguard our community and the lives of the staff, inmates and visitors.
> 2.  To ensure that all inmates committed to our custody are provided with a safe and humane treatment consistent with applicable standards, laws, judicial decisions and community expectations.
> 3.  To provide those essentials of human life, i.e., medical/mental health care, nutritious meals, clean environment and the opportunity for maintaining family and personal contacts to all within our care.
> 4.  To further the principles of direct supervision by managing those committed to our custody as people with as much dignity and respect possible in the regulated environment required of a detention facility.
>
> B.  Operational Objectives
> 1.  To manage inmates in an objective and courteous manner, dealing with each inmate firmly and fairly.
> 2.  To be attentive to the needs and concerns of inmates, citizens and the facility.
> 3.  To promote a positive demeanor that inspires confidence and trust.
> 4.  To be proactive with regards to inmate management rather than taking a reactive approach.
> 5.  To ensure that the use of force or special management is not used punitively, absent due process.

(Doc. 126 at 6 ¶ 14.)  Furthermore, at the time the assaults took place, the governing Sheriff's Office policy and appendix provided in part:

> VI.7:  All employees shall comply with Sheriff's Office orders, directives, rules and regulation, policy and procedures, and administrative policies of Sedgwick county, and Civil Service Board rules and regulations.
> VI.20:  Every employee shall report to a supervisor any incident against the good order, efficiency, discipline, or that which is contrary to the Core Values of the Sheriff's Office that he/she observes or of which he/she has knowledge.
> V.2:  Employees shall not commit or be involved in any crime established in federal code, state statute, county resolution, or city ordinances . . . .

V.3:  Engage in unbecoming conduct.  Unbecoming conduct shall include that which brings the Sheriff's Office into disrepute or reflects discredit upon the employee or the Sheriff's Office, or that which impairs the morale, operation, or efficiency of the Sheriff's Office or employee.

V.9:  Except in the discharge of his/her official duties, no employee shall knowingly:

1.  associate or fraternize with inmates, known felons, persons convicted of crimes involving moral turpitude, or persons engaging in unlawful pursuits; or

2.  transact any business or have any dealings which are significant, substantial, or illegal with inmates, known felons, persons convicted of crimes involving moral turpitude, or persons engaging in unlawful pursuits when such conduct reasonably reflects disrepute or discredit on the employee or the Sheriff's Office . . . .

(*Id.*; Doc. 126 at 7 n.2.)

Detention deputies were trained and supervised to comply with and to implement Sheriff's Office policies.[6]  Per policy and training, deputies were required to report all violations of policy observed.  Detention deputies' compliance with policy and job performance was directly supervised by sergeants on a day-to-day basis.  Civil service rules applied to disciplinary actions.  At all relevant times, detention deputies' work was generally supervised by the deputies' direct supervisor, i.e., their sergeant on duty.  The sheriff's sergeants generally monitored deputies' work in PODs through unscheduled visits at least once each shift.

Hinshaw, then-Major Glen Kurtz, and Captain Gregory J. Pollock, II, testified that although the words "zero tolerance" to sexual assault and harassment were not expressly written in Jail policy literature until after 2012, a de facto zero tolerance policy to sexual assault and harassment was enforced.[7]

---

[6] Plaintiff attempts to dispute this fact and several others throughout defendants' brief by stating that it is opinion testimony and such "conclusory and self-serving" declarations have been deemed insufficient in the summary judgment context.  The court does not agree this is an opinion because it is made from Hinshaw's personal knowledge.  Where Hinshaw's declaration does set forth opinions, it is clear in context.  The court does not believe opinion testimony is irrelevant here, where Hinshaw's opinions could be relevant to his own state of mind.

[7] Plaintiff argues that Pollock's testimony does not support this because he testified that he was "not quite familiar that zero tolerance actually exists . . . ."  (Doc. 121 at 19 ¶ 25.)  Taken in context with

Hinshaw gave Kurtz the responsibility of ensuring the Jail was compliant with regulations Hinshaw anticipated the federal government would issue as part of the PREA.[8]  While Hinshaw was sheriff, he was aware that Kurtz prepared or directed preparation of PREA training materials even while the correction community was waiting for the federal regulations required by PREA.  The materials were used at the academy and at in-service training programs for deputies.  Instruction on PREA and the impropriety under policy and law of staff sexual misconduct (including a discussion of Kan. Stat. Ann. § 21-3520) was provided at the academy and in annual in-service training.[9]  In presentation materials used at in-service training, deputies were told, among other things:

> PREA was to "Establish Zero Tolerance" to sexual misconduct.

> [There is] "No Such Thing as 'Consensual Sexual Contact' between staff and inmate."

---

the rest Pollock's testimony, however, it supports that the Sheriff's Office had a de facto zero tolerance policy:

> Q.  Have those two words been placed by the Sedgwick County Sheriff's Office—those words being zero tolerance—into a policy of the Sedgwick County Sheriff's Office at some time?
>
> A.  I don't know that exact phraseology exists in our policy, but it would be implied through our policy.  If a crime is reported, it is required for us to conduct a thorough and complete investigation.
> I am aware [] that the sheriff's office has gone to lengths to provide information to inmates and to staff that there are several ways to report allegations of misconduct.  So while I'm not quite familiar that zero tolerance actually exists, I believe it is implied through the actions of the sheriff's department and its employees.

(Doc. 112-7 at 17:15–25.)  With this additional context, it is clear that the section plaintiff quoted related only to the written words "zero tolerance."

[8] Plaintiff attempts to controvert this by stating that Kurtz testified at his deposition that "Before '12 there were no standards to do much with.  We could do some general education with the inmates and staff, but there was really nothing before that as a standard to say, this is what your rights are, this is what our responsibilities are."  (Doc. 121 at 19 ¶ 26.)  He also stated during his deposition that "Everybody was sitting around tracking this and waiting to see what the final standards were going to be" and "everybody was just sitting on their thumbs waiting for the standards."  (Doc. 121 at 20 ¶ 26.)  The deposition transcript that plaintiff provided to the court is so highly redacted, sometimes only showing a partial sentence, that the court cannot tell what questions the statements were purporting to answer or, in two instances, whether they actually are answers.  (Doc. 121-7 at 46:20–24, 51:6–7, 52:7–8.)  No context is provided for any of the statements.  This is insufficient to controvert defendants' proposed fact, which is supported by Hinshaw's affidavit.

[9] Effective July 2011, the applicable statute became Kan. Stat. Ann. § 21-5512.

Per KSA 21-3520, Part II Prohibited Act, Article 35 Sex Offenses
- Employee, Parole Officer, Volunteer or Contractor of DOC, LEO, Employee of Detention Facility or Contractor, Employee, Contractor or Volunteer of JJA,
- Level 10 Person Felony
- "Romantic" relationships between staff and inmates are included in this definition.

Every employee shall report to a supervisor any incident against the good order, efficiency, discipline or that which is contrary to the CORE VALUES of the Sheriff's Office that he/she observes or of which he/she has knowledge.

Employees shall not commit or be involved in any crime established in federal code, state statute, county resolution or city ordinances.  Nothing in these regulations prohibits disciplining or charging employees because the alleged act or omission does not appear herein.

(Doc. 112 at 8–9 ¶ 27.)  Kendall attended at least two in-service presentations regarding the PREA, one in June 2011 and a separate program on a date unclear to the court.

### D.  The Jail in 2012

At all relevant times, indirect supervision PODs, such as POD 2, were staffed by a single detention deputy.  Inmates in such PODs were nearly all housed in single-man cells.  The detention deputy supervised the POD from a partially glassed-in room, a "deputy booth," which separated him or her from the inmates.  The PODs cell doors could be opened remotely by the supervising detention deputy from the deputy booth.  For a deputy to access a cell in an indirect POD, the deputy had to enter one of the POD's day rooms through a locked door and then open the cell's locked door. When the cell's doors closed, they automatically locked.  At that time, in a direct pod, inmates had their own individual cells, there was a common area in which the inmates could work, and the detention deputy would sit in the open with just a desk.[10]

In 2012, Hinshaw understood and expected detention and contractor employees would frequently move in and out of parts of the indirect supervision PODs at all times during the day.  POD

---

[10] Hinshaw testified that "some are now double bunked because of the added bed space[.]"  (Doc. 121 at 33 ¶ 36.)

deputies were assisted by roving deputies, who often entered and exited PODs while performing their

duties. Deputies were required to make periodic wellness checks on inmates throughout the day.

These checks were performed by deputies assigned to the POD or roving deputies.  This frequently,

but not always, was a two-person task.  One deputy would stay at the deputy booth, while the second

deputy entered the inmate common areas of the POD to check on inmates in their cells.  Roving

deputies assisted with distributing medication, laundry exchanges, service of inmate meals, and inmate

movement.  Inmates were frequently moved in and out of PODs at all hours of the day for various

appointments and reassignment of cells.  Depending on the security level of the POD and the inmates'

classification or destination, inmates entering and exiting PODs were escorted or unescorted by

detention deputies.  The medical staff at the Jail and employees of other contractors were frequently in

the PODs.

      "Master Control" was the "nerve center" of the Jail.  Officers assigned to Master Control were

responsible for monitoring nearly all of the three-story, two city-block-sized Jail.  In 2012, the deputies

remotely monitored 200 to 250 video cameras throughout the Jail premises, independently controlled

nine elevators, and opened and closed about 1,500 electronically actuated doors.  In 2012, lights

alerted those in Master Control when the doors into a POD or a deputy booth were open.  In 2012, the

cameras, which connected to two VCRs, did not record and nobody at the Jail knew how to set them

up to record or knew whether they were capable of recording.  It is not clear whether the cameras ever

had recorded.[11]  In his affidavit, Hinshaw stated that in 2012, "it was not practical for detention

---

[11] Hinshaw's testimony regarding this follows:
      Q.     And during the time you were there, however, the VCRs just never really got
functioning in terms of preserving images.
      A.     I remember early on when I went over there as a captain, I cannot even tell you who I
was talking to, it was a lieutenant, saying, well, why aren't we using these?  And the response was,
well, they've never worked right, and, quite frankly, I'm not even sure if anybody knows how to get
them to connect to the right camera. . . .  I think the original concept as it was told to me was,

deputies to record routine events monitored by its cameras.  The cameras installed at the Jail could not digitally record images." (Doc. 112-2 at 7 ¶ 19.)  In 2012, the cameras in POD 2 were fixed on the POD's deputy booth.  In his affidavit, Hinshaw stated that cameras "could not be used to routinely monitor the inside of inmate cells" because it "would unreasonably interfere with the inmates' limited privacy rights." (Doc. 112-2 at 7 ¶18.)  He stated that he believed that the "primary exception and perhaps the only exception to this is the monitoring of inmates who are a suicide risk." (*Id.*)  In 2012, there was no system alerting Master Control when jail cell doors opened without a deputy's announcement that they were going to open them.

### E.  Funding for Cameras

At his deposition, Hinshaw admitted that he knew the cameras needed to be updated.[12]  Also, current Sheriff Jeff Easter, who replaced Hinshaw, testified that when he took over as sheriff, the "system for recording activity in the jail" was "outdated." (Doc. 121 at 49–50 ¶ 74.)  Hinshaw did not request funding for new cameras before 2011.  Hinshaw requested funding for new cameras once or twice.  While the Jail's operation is the responsibility of the sheriff, Sedgwick County supplies the funding for the Jail's operation.  Hinshaw further stated in his affidavit that he "lacked funding from Sedgwick County and the authority to make significant improvement in remote camera surveillance while sheriff.  [He understood] that the improvements to Master Control, addition of more cameras and

---

something happens, you put a videotape into a video recorder and then you link it up to the particular camera you want to record.  So the – I think it was the lieutenant I was talking to said, it's never worked right, and I don't think anybody even knows how to do it now.

[12] At his deposition, Hinshaw testified as follows:

> Q.  Were there ever any budget items that you submitted as sheriff where you recall putting in the request the specific statement that this is designed to enable us to better deal with prison rape?
> A.  I don't recall using that as part of the budget.
> Q.  Do you recall if every year you asked for more cameras?
> A.  I think I only did – asked for the cameras once.  I know we – we needed it replaced, but it was a matter of whether or not we could fit it into the budget.

(Doc. 121 at 48 ¶ 70.)

recording capabilities, planned or implemented at the Jail after 2012, cost approximately $4 million."
(Doc. 112-2 at 7 ¶ 19.)  Very shortly after Hinshaw left office, because of Hinshaw's funding request,[13]
the department added seventeen body cameras for deputies and 200 more area-monitoring cameras, all
digital and all recordable.  The body cameras were used by sergeants and interdictions, but not roving
deputies or other deputies at the time of Easter's deposition.  At his deposition, Hinshaw testified that
he never cited the need to better deal with prison rape as a part of a budget request.  Although perhaps
available at a later date to the Jail, at the time, grants available from the Department of Justice in
connection with the PREA were not available to the Jail, and Sedgwick County had to fund the
cameras itself.

### F.  Kendall's Knowledge

Kendall claims to have had consensual sex at the Jail with inmate Jeff Taylor on June 3, 2012
and twice before.  No evidence in the summary judgment record supports that his supervisors were
actually aware of this.  Kendall acknowledges sex with inmates at the Jail did not further any business
interests of the Sheriff's Office or any legitimate jail purpose.  He says the sex he had with Taylor was
purely for his own personal purpose.

Kendall knew sexual behavior between detention staff and inmates was forbidden and illegal.
He knew sexual behavior between detention staff and inmates was also forbidden by Sheriff's policies.
He stated that he knew such relations were forbidden by his exercise of common sense.  He also

---

[13] Easter testified as follows:

> There was [sic] only about 250 cameras.  We – Sheriff Hinshaw had worked on trying
> to secure funding from the [Board of County Commissioners].  It would have been done
> much sooner, but the BOCC finally approved our master control project in 2013.  That
> project is now complete, and due to the fact that we would have an additional – we have
> about 450 cameras, so we added about 200 cameras that are all digital and recordable.
> That is the reason why we did not equip every deputy with AXON cameras, because to
> do that, that's a five-year commitment.

(Doc. 126 at 49 ¶ 75.)

received training that made it clear sexual relations between detention staff and inmates were illegal and forbidden.  Kendall never heard a jail guard could get away with sex with inmates.  Kendall stated such sex was not encouraged by Hinshaw or Sedgwick County.

### G. Reporting Procedure for Inmates

In his declaration, Hinshaw stated that he knew that occasionally, over the years, allegations of sexual misconduct had been made involving deputies, but all such claims were thoroughly investigated to his knowledge and sexual assault had "not been an issue at the Jail."  (Doc 112-2 at 9 ¶ 24.) Hinshaw described the following procedure:

> Long before April 15, 2012, whenever an allegation of sexual misconduct in the Jail was made, it was to be documented and investigated.  Sheriff's policy required completion of formal report(s) and a complete investigation.  Where a possibility of a crime was involved, incidents were fully investigated by the Sheriff's criminal investigations detectives, [a] section of the Sheriff's organization that was and is completely separate from the Jail.  Additionally, the Sheriff's Professional Standard Unit ("PSU") independently investigated, per Sheriff's policy, any allegation asserting misconduct on the part of detention deputies or staff.  [The PSU] was required to investigate allegations of consensual sexual relations between detention deputies or staff and an inmate because consensual sexual relations violated Sheriff's policies.

(Doc. 112-2 at 10 ¶ 25.)  While Hinshaw was Sheriff, there were multiple pathways for a complaint of sexual assault or abuse against an inmate to be initiated, including anonymous complaints.  As examples, the inmate could make the complaint verbally to a POD deputy; send a written message by the Jail mail system to a deputy, sergeant or more senior officer; or place a free phone call to crime stoppers or to the Jail's administration.  Furthermore, an inmate's family, friend, or lawyer could make the complaint on his or her behalf.  It was the Sheriff's Office's policy that all complaints be investigated.

### H. Past Deputy Sexual Misconduct with Inmates

For the years 2005 through 2011, the Sheriff's Office records show the following complaints and investigations concerning sustained complaints of sexual misconduct in the Jail:

- In 2006, a deputy reported that a female inmate had allowed a detention deputy to kiss her and touch her breast. The investigation confirmed her claims. The deputy lost his job and the matter was referred for criminal prosecution.

- In 2007, an inmate, Crystal Trevino, reported that a deputy, Weldon Mills, had inappropriately fondled her. He also sent cards and letters to inmate Trevino and another inmate. Mills resigned during the investigation.

- In 2009, after inmates' contemporaneous reports that another female inmate, Robin Lassiter, was having consensual sexual relations with a male detention deputy, Scott Bledsoe, an investigation established the inappropriate relationship occurred while she was incarcerated and that Bledsoe had shared a pornographic video with Lassiter after she was released from custody. Detectives also investigated whether criminal conduct occurred, and the investigation conclusion was inconclusive in that regard. The supervisor reviewer of the report recommended termination. No evidence suggests that Bledsoe's employment was not actually terminated.

- In 2010, an investigation of an inmate's report that two other female inmates were having sexual relations with a male deputy, Deryk Faber, found that the deputy had inappropriate consensual relations with the inmates. The deputy lost his job and the matter was referred for criminal prosecution.

**I.  Not Sustained or Unfounded Reports of Deputy Sexual Misconduct with Inmates**

For the years 2005 through 2011, the Sheriff's Office records show the following complaints that were made against deputies for which the investigation outcome was not sustained or unfounded.

- In 2005, an inmate claimed she was raped by a detention deputy. The claim was investigated and held unfounded.

- In 2007, an inmate claimed she was sexually assaulted during a pat-down search. The claim was investigated and held unfounded.

- In 2008, an inmate reported that another female inmate was having consensual sexual relations with a male detention deputy. The claim was investigated and held unfounded.

- Also in 2008, a female inmate, Katie J. Robertson, alleged a male detention deputy, Myles Lewis, saw her shower. The claim was investigated and held not sustained.

- In 2009, an inmate alleged she was raped by unknown detention deputies and inmates. The claim was investigated. The inmate was transported to a hospital for a SANE/SART kit, which did not reflect any physical evidence of rape. The inmate would not pick out the deputy who she claimed raped her. Drug tests revealed that the inmate had methamphetamine and marijuana in her system. Because there was no valid suspect, the investigating detective put the case on "inactive" status.

- Also in 2009, an inmate claimed she was impregnated by a detention deputy. The claim was investigated and held unfounded.

- Lastly in 2009, an inmate complained that a deputy watched her shower. The claim was investigated and held unfounded.

- There may have been one additional complaint of sexual misconduct in 2009 which was investigated and found unsubstantiated.

- In 2010, upon a log entry by a female deputy, the Sheriff's Office opened an investigation because a male deputy mistakenly walked in on an inmate while she was in her bra and underwear waiting to be strip-searched by a female deputy. The claim was investigated and was sustained, but the investigator reported that it was an "honest mistake" and no policy or procedures were violated.

- Also in 2010, a male inmate claimed he was fondled during a search.  The claim was investigated and held unfounded.

- There may have been an additional complaint of sexual misconduct in 2010 which was investigated and held unfounded.

- In 2011, an inmate accused a male deputy of sexual battery for touching her on the elbow with a piece of paper.  The claim was investigated and held unfounded.[14]

**J.   Instances of Delayed Reporting and Investigation of Allegations**

On February 8, 2007, Stacy Burke, a Sergeant with the Sheriff's Office, received an Inmate Request Form from inmate Jamin Pitchford stating that he wanted to press criminal charges against someone for sexually assaulting him.  While, as noted above, the claim was investigated and held unfounded, Pitchford also stated that "he had written several 'Inmate Request Forms' to a supervisor regarding the incident."  In late February 2007, Lieutenant Maurice Evans found those unanswered forms in his inbox.

The court's own review of plaintiff's exhibit shows that, construing the facts in the light most favorable to plaintiff, a total of four Inmate Request Forms, three dated January 20, 2007 and one dated January 24, 2007, were found in Evans's inbox.  Evans had no explanation as to why he did not see

---

[14] The parties refer to other instances of misconduct which do not fit squarely in the categories:
- In 2010, a complaint that a deputy neglected to secure a door, which allowed a male inmate into the area to molest a showering female inmate, was sustained.  The deputy was suspended without pay.  Because the deputy did not sexually assault the inmate and PSU did not find the neglect was purposeful, the court does not find this incident material to the issues in this case.
- In 2007, an inmate alleged that a contractor physician's assistant in the Jail's clinic hugged her after a clinic visit.  The claim was investigated and held unfounded.  Because the claim was against a physician's assistant who was not an employee of the Sheriff's Office or a deputy, the court does not find the complaint material to the issues in this case.
- Also in 2007, an inmate claimed that an arresting deputy inappropriately touched her while arresting her and handcuffing her on a hotel bed.  The claim was investigated and held not sustained.  Because the claim was made against an arresting officer and not a detention officer working in the Jail, the court does not find the complaint material to the issues in this case.

them before that time.  (Doc. 113-7 at 5.)  There is no evidence supporting when the complaints were placed in Evans's inbox.  The report displays the signature of Lieutenant Larry Bragg, and a notation shows that a captain concurred with the recommendation.  The recommendation showed that the allegations were unfounded and no further action was warranted.  The recommendation was followed by a note, in which Bragg explained that Evans had not found the complaints in his inbox until late February.  The note does not recommend any action for Evans's failure, and plaintiff provides no evidence suggesting that it would include such a recommendation if it existed.

PSU investigated detention deputy, John Sauer, for failing to timely report an inmate Patricia Violetti's complaint that a deputy had raped her.  The report notes that Sauer reported the sexual assault himself, but not until April 24, 2008, while he had received the information on October 2007.[15] The report reflects that Sauer withheld reporting the allegation because the inmate asked that he not tell anyone.  Sauer received a five-day suspension for intentionally withholding information regarding a crime.[16]

PSU investigated Sauer a second time related to a failure to report the 2008 incident allegation by inmate Robertson that a deputy had watched her shower.  Robertson had asked Sauer for an Inmate Request Form, which he provided, and he told another deputy, who prepared a report on the matter, but Sauer did not report Robertson's allegation himself.  He received a written reprimand for failure to report an incident to his supervisor, which was placed in his employment file.

While PSU was investigating the allegations that deputy Faber had an inappropriate physical relationship with two female deputies in 2010, the criminal investigator interviewed Faber's roommate, Rodrick Little, who was also a deputy for the Sheriff's Office.  Based on comments Little made during the criminal interview, PSU also interviewed Little and concluded that the investigation revealed

---

[15] Neither party presented evidence of the investigation of inmate Violetti's allegations.
[16] (Doc. 113-10 at 3.)

credible evidence to indicate Little failed to report an incident to his supervisor.  The records do not indicate whether there was further investigation regarding Little or whether Little was disciplined for this; it only provides the factual findings.[17]

### K.  **Alleged Rape of Inmate Jeffrey Taylor**

On June 12, 2012, inmate Jeffrey Taylor accused Kendall of raping him in the early morning of June 12, 2012 in Taylor's cell in the direct supervision POD 7.  Taylor was immediately taken to St. Joseph hospital and a SANE/SART examination was performed on him.  On June 18, 2012, six days after Taylor accused Kendall of raping him, plaintiff's attorney made a complaint on plaintiff's behalf that Kendall had sexually assaulted plaintiff on April 14, 2012 and forcibly raped him on April 15, 2012.  This was the first notification of the alleged sexual assault on plaintiff by Kendall.

During interviews with inmates after Taylor's incident, eleven other inmates claimed Kendall had made inappropriate comments to them, asked for sexual acts from them sometimes in exchange for cigarettes, kissed them, or, in one case, allegedly forced him to perform oral sex on him.  Based on these investigations, Kendall was charged in Sedgwick County with six counts of attempted unlawful sexual relations and one count of making a false information.  Two of the counts of attempted unlawful sexual relations related to Taylor's and plaintiff's allegations against Kendall.

Hinshaw had no personal involvement or any contact with plaintiff.  Hinshaw was never Kendall's direct supervisor.

---

[17] Plaintiff also notes that emails collected between Little and Faber showed the following email exchange:
> Little:  I'm telling 10J010191 is your new chic
> Faber:  Rose claimed her before she went through the sliders.
> Little:  your night just got better

(Doc. 121-20.)  The purpose for introducing this evidence is not apparent to the court.  Although it appears the emails are in bad taste and probably not an appropriate use of work time, without any context, it is not reasonable to infer that the emails are evidence that Little or Faber were involved in misconduct that would be material to the issues in this case.

**L.  Incidents After Taylor's Report**

Some inmates lodged complaints against other deputies after plaintiff made his complaint against Kendall in mid-June.  Those complaints were investigated, and some were sustained.

**M. Changes After 2012**

Most of the changes occurring to get the Jail compliant with PREA regulations took place after 2012 when the regulations went into effect.  For instance, as already discussed, the sheriff's department added seventeen body cameras and 200 more digital cameras, all of which could record. The cameras were those that Hinshaw requested.

**N.  Lieutenant Evans**

Lieutenant Evans, who had not noticed Pitchford's complaints in his inbox in January or February 2007, was appointed the Jail's PREA Coordinator in 2013, after the incidents at issue here and after Hinshaw's appointment as Sheriff ended.[18]

**IV.  Analysis**

The court has reviewed at length the briefs and the law governing this case. As required under the legal standards for summary judgment, the court has considered those facts that are uncontroverted and viewed them in the light most favorable to plaintiff.

---

[18] Plaintiff states that Evans testified that he would not be surprised if he had made the following statement in April 2014 to the media at a press conference:
"Where in past years some complaints might have 'fallen on deaf ears' depending on the severity, now all complaints are addressed."  (Doc. 121 at 38 ¶ 44.)  Evans then explained the comment in his deposition as follows:
> Nationally speaking, when inmates in other facilities throughout the United States
> would make complaints, a lot of times they just didn't get listened to.  And they
> wouldn't be reported.  Had nothing to do with what was going on inside Sedgwick
> County jail.  I was just trying to draw a parallel for those people that were in the room at
> that time to say, okay, this is the way it was years ago, this is the way things are now.
(Doc. 121-3 at 54:20–55:3.)  The deposition transcript is so heavily redacted, the court cannot determine whether the statement relates to complaints of sexual misconduct.  This evidence does not support an inference that Evans knew the Jail was full of risks.  Therefore, it is immaterial.

### A.  Plaintiff's Claims Under 42 U.S.C. § 1983

Plaintiff alleges defendant Kendall violated his Eighth Amendment rights by sexually assaulting plaintiff.  Plaintiff alleges defendants Sedgwick County and Hinshaw are both liable under 42 U.S.C. § 1983 because they were deliberately indifferent to the risk of sexual abuse.  (Doc. 107 at 19.)  Defendants Sedgwick County and Hinshaw move for summary judgment on plaintiff's claims under § 1983.  Defendants argue that plaintiff cannot show a "long accepted custom of the violation of the constitution that plaintiff claims, *i.e.*, forcible sexual contact."  (Doc. 112 at 16.)

#### 1.  Plaintiff's § 1983 Claim Against Sedgwick County

Plaintiff alleges that Sedgwick County violated plaintiff's Eighth Amendment constitutional rights and is liable under 42 U.S.C. § 1983.  Plaintiff argues that defendant is liable in the areas of custom/usage/practice and inmate protection.  The proper standard for an Eighth Amendment claim such as this is "deliberate indifference."  *Berry v. City of Muskogee*, 900 F.2d 1489, 1495 (10th Cir. 1990).  Under this standard, "an official or municipality acts with deliberate indifference if its conduct (or adopted policy) disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights."  *Id.* at 1496.  Deliberate indifference requires "a higher degree of fault than negligence, or even gross negligence."  *Id.* at 1495 (citing *City of Canton v. Harris*, 489 U.S. 378, 388 & n.7 (1989)).  The "mere fact that an assault occurs . . . does not establish the requisite indifference to a prisoner's constitutional rights."  *Hovater v. Robinson*, 1 F.3d 1063, 1066 (10th Cir. 1993) (quoting *Zatler v. Wainwright*, 802 F.2d 397, 403 (11th Cir. 1986)).  Actual knowledge of an excessive risk is not required.  Imputation of constructive knowledge in this case requires a showing that "the underlying unconstitutional misconduct was 'so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of [it].'"  *Jojola v. Chavez*, 55 F.3d 488, 491 (10th Cir. 1995).  In response, the defendant may present evidence to show

that he was in fact unaware of the risk, in spite of the obviousness.  *Tafoya v. Salazar*, 516 F.3d 912, 917 (10th Cir. 2008).

Here, the basis for plaintiff's constitutional claims is Sedgwick County's and Hinshaw's allegedly unreasonable inaction—therefore, plaintiff must show both that there was an obvious risk that an inmate would be sexually assaulted by a guard and that defendants then failed to change the policy or act to prevent predicable violations of federal law.  *See Berry*, 900 F.2d at 1495.  Plaintiff suggests that the following support a finding of Sedgwick County's deliberate indifference to a substantial risk that plaintiff would be sexually assaulted or raped in 2012: (1) deficiencies with the surveillance system and deputies' access to inmate cells; (2) deputies failing to report inmate complaints and a subsequent lack of discipline; (3) a failure to implement an explicit zero tolerance policy; and (4) Sedgwick County's appointment of Evans as PREA Coordinator in 2013.  The court considers each of these to determine if plaintiff raises any inferences supporting a finding that defendants acted with deliberate indifference or conscious disregard for an obvious risk that a deputy would sexually assault an inmate.

### a.        Surveillance System and Inmate Cell Access

The uncontroverted, admissible evidence shows that in 2012, the Jail was monitored by 200 to 250 cameras, which deputies in Master Control monitored.  At least in POD 2, where plaintiff was allegedly assaulted and raped, the cameras were fixed on the officer's work station.  The cameras did not record; although two VCRs were available, nobody in the Jail knew how to hook them up or whether they had ever been functional.  For privacy, the inside of inmates' cells were not monitored unless they were on a suicide watch.  Plaintiff does not offer any evidence of other blind areas within the Jail.  Plaintiff argues that this surveillance system was inadequate and supports a finding of conscious disregard for an obvious risk sexual assault by guards on inmates.  Roving deputies also

could open inmate cell doors without alerting Master Control.  Plaintiff argues that this presented a risk of deputy abuse of inmates.  Without more, the court does not agree that because the cameras did not record or view the inside of inmate cells, there was an "obvious risk" that was "very likely to result in the violation of a prisoner's constitutional rights."   Likewise, plaintiff has not shown that because Master Control was not alerted when a roving deputy opened a cell door, this presented an "obvious risk" that was "very likely to result in the violation of a prisoner's constitutional rights."  "Absent evidence to the contrary, we assume that jailers will not violate models of social decorum or otherwise commit a punishable offense."  *Whitson v. Stone Cty. Jail*, 602 F.3d 920, 927 (8th Cir. 2010).

### b.        Deputy Failures to Report and Subsequent Discipline

Plaintiff also suggests that non-reporting was widespread throughout the Jail.  The record contains four instances involving three deputies, which plaintiff characterizes as staff "cover-ups." First, plaintiff cites to Lieutenant Evans's failure to address inmate Jamin Pitchford's Inmate Request Forms that were in Evan's inbox until late February 2007, after Pitchford had already complained to another officer and the investigation commenced.  Plaintiff states that Evans received no discipline for the incident, but plaintiff offers no evidence to support this.  Plaintiff merely refers to the investigative report of Pitchford's complaint.  At the end of the report, the drafter noted Evans's failure to bring forward the complaints until February.  Plaintiff asks the court to infer that because the report does not contain suggested discipline related to Evans, that Evans received no discipline.  Without more, the evidence does not support this inference.  Plaintiff did not provide any evidence that such information would have been contained in the report of Pitchford's allegations if it existed, nor did plaintiff even state that he requested Evans's records of misconduct in discovery and the records reflected no discipline or investigation.  ***Plaintiff*** has the burden of proof on his claims, and therefore ***plaintiff*** must

show that there was an excessive risk and defendants acted with deliberate indifference.[19]  Defendant does not have the burden to negate plaintiff's allegations.  Therefore, the fact that Pitchford's complaint investigation report does not reflect that Evans was disciplined does not support a finding of deliberate indifference to an obvious risk of either non-reporting or sexual misconduct.

Plaintiff also suggests that the two incidents involving deputy Sauer could support a finding of deliberate indifference to an obvious risk of sexual misconduct.  As discussed above, PSU investigated detention deputy Sauer for failing to timely report an allegation that an inmate had been raped by another deputy.  The report notes that Sauer reported the sexual assault himself, but not until April 24, 2008, when he had received the information on October 2007.  The report reflects that Sauer withheld reporting the allegation because the inmate asked that he not tell anyone.  Sauer received a five-day suspension for intentionally withholding information regarding a crime.  PSU investigated Sauer a second time for failing to report the 2008 allegation by inmate Robertson that a deputy had watched her shower.  Robertson had asked Sauer for an Inmate Request Form, which he provided, and he told another deputy, who prepared a report on the matter, but Sauer did not report Robertson's allegation himself.  Sauer received a written reprimand for failure to report an incident to his supervisor, which was placed in his employment file.  Plaintiff argues that because Sauer received lighter discipline for the second violation, the court should infer that defendant was deliberately indifferent to non-reporting. The court does not agree.  Defendant provides evidence that the circumstances surrounding the first incident were more egregious—intentionally withholding information regarding a crime—than the

---

[19] *See Doe v. Bagan,* 41 F.3d 571, 573 (10th Cir. 1994) (stating that plaintiffs bear the burden of proof on the essential elements of a cause of action arising under Section 1983).  Because defendants do not bear the burden of persuasion, their obligation is to produce affirmative evidence negating an essential element of the claims or to show that plaintiff lacks evidence to carry his burden.  *See id.*  Once defendants satisfy their burden, plaintiff can only avoid summary judgment if he presents evidence creating "an inference of the existence of each element essential to the case with respect to which [he] has the burden of proof." *Terra Venture, Inc. v. JDN Real Estate–Overland Park, L.P.*, 443 F.3d 1240, 1243 (10th Cir. 2006) (citations omitted).

second incident—failure to report an incident.  Plaintiff provides no evidence that, given this context, it was inappropriate under the circumstances for defendant to impose lighter discipline for a failure to report an incident than intentionally withholding information regarding a crime.  Without this evidence, the inference plaintiff requests the court to make is mere speculation.  Therefore, the discipline Sauer received for his two instances of failure to report do not support a finding of deliberate indifference to an obvious risk of sexual misconduct.

While PSU was investigating the allegations that deputy Faber had an inappropriate physical relationship with two female deputies in 2010, the criminal investigator interviewed Faber's roommate, Rodrick Little, who was also a deputy for the Sheriff's Office.  Based on comments Little made during the criminal interview, PSU also interviewed Little and concluded that the investigation revealed credible evidence to indicate Little failed to report an incident to his supervisor.  The records do not indicate whether there was further investigation or whether Little was disciplined for this.  Inferring that Little was not disciplined, however, would require evidence from plaintiff showing that plaintiff requested Little's disciplinary file or investigative files regarding this incident, or that the discipline request would be noted on Faber's investigation report if it existed.  Without more, PSU's report of Faber's misconduct does not support that Little was not disciplined for a failure to report, nor does it support a finding that Little should have received discipline.  Therefore, this incident does not support an inference that Sedgwick County consciously disregarded an obvious risk that deputies would sexually assault inmates.

While the  incidents of failing to report may support that the three individual detention officers failed to comply with Jail policy that required reporting inmate complaints, they do not support a finding of deliberate indifference or conscious disregard on the part of Sedgwick County or Hinshaw.  Either the uncontroverted facts show that the employees were disciplined for their failures to report, or

plaintiff has failed to come forward with any evidence supporting an inference that the detention officers were not disciplined or the matter was not further investigated.

### c.      Failure to Implement Explicit Zero Tolerance Policy

Plaintiff also states that defendants ignored the mandates of the PREA and failed to change their training program.  Presumably, plaintiff argues that because training and policy materials did not explicitly mandate "zero tolerance" toward sexual misconduct, defendants did not comply with the PREA.  First, compliance with the PREA standards, including any requirement that "zero tolerance" be explicitly noted in policy materials, were not mandated until after plaintiff's claim arose.  Furthermore, defendants have produced evidence that the Sheriff's Office had a de facto zero tolerance policy toward sexual misconduct, and that every deputy found engaging in sexual misconduct was fired. Plaintiff has presented no admissible contrary evidence.  Plaintiff has failed to come forward with any evidence that an employee continued to work at the Jail after being found to have engaged in sexual misconduct with an inmate.  Neither has plaintiff presented any evidence that deputies thought they could continue to work at the Jail if they were found to have engaged in sexual misconduct.  Under these facts, the court concludes that no reasonable jury could find that Sedgwick County acted with deliberate indifference to an obvious risk of plaintiff's safety by failing to adopt an explicit zero tolerance policy for sexual misconduct before 2012.  *See Keith v. Koerner*, No. 11-cv-2281-DDC-JPO, 2015 WL 4920283, at *8–9 (D. Kan. Aug. 18, 2015).

### d.      Lieutenant Evans's Appointment to PREA Coordinator in 2013

And finally, plaintiff suggests that Evans's appointment in 2013—after the incidents at issue in this case—to the PREA Coordinator position supports a finding of conscious disregard or deliberate indifference given Evans's overlooking inmate Pitchford's Inmate Request Forms in Evans's inbox in 2007.  Without any facts supporting that defendants were or should have been aware of an obvious risk

within the Jail that plaintiff would be sexually assaulted or raped in 2012, this act of Sedgwick County in 2013 fails to support a finding of conscious disregard or deliberate indifference.

Further, this case is distinguishable from *Tafoya v. Salazar*, 516 F.3d 912 (10th Cir. 2008), which plaintiff cites.  In *Tafoya*, the Tenth Circuit held that the district court erred when it granted summary judgment on plaintiff's § 1983 after being sexually assaulted by guards.  There, the sheriff had been subject to three civil suits related to prison guard attacks on female inmates before plaintiff's case arose.  In the previous cases, the court had discussed the sheriff's failure to adequately address inmate complaints, conduct employee reviews and background checks, be physically present at the jail, and discipline the inappropriate conduct of detention officers.  *Id.* at 917.  After three assaults occurred, the sheriff in Tafoya still did not alter his management style or impose a serious threat of discipline on his employees for policy violations.  *Id.*

In contrast, plaintiff here presents no evidence of Hinshaw's failure to conduct employee reviews and background checks on employees, be physically present at the jail, or discipline inappropriate conduct of detention officers.  To the extent three deputies (out of 330 employees) on four occasions over seven years failed to report alleged sexual misconduct immediately, the uncontroverted facts either show that the employees were disciplined or plaintiff fails to provide evidence that supports an inference that they were not.  Furthermore, in contrast to the plaintiff in *Tafoya*, here plaintiff offers no evidence of how Sedgwick County's jail administration deviated from generally accepted standards.  *Id.* at 918.  The record does not show that Sedgwick County received any sustained complaints of sexual assault or rape before Taylor's, and plaintiff lodged his allegation five days later.  Plaintiff provides no evidence of substantiated policy violations going undisciplined.  Plaintiff does not provide any evidence that inmates believed their complaints would go unnoticed.

-27-

Instead, defendants provide evidence that every complaint was investigated, even those that were reported late.

Under the facts presented by plaintiff, no reasonable jury could find that the risk of deputies sexually assaulting inmates was so obvious that Sedgwick County policy makers should have known about it and consciously disregarded the risk. Furthermore, there is insufficient evidence that underlying misconduct was so widespread or flagrant that in the proper exercise of its official responsibilities, Sedgwick County should have known about it.

### 2.  Plaintiff's § 1983 Claim Against Hinshaw[20]

To survive summary judgment, plaintiff must provide evidence that supports Hinshaw's individual liability under § 1983 by showing Hinshaw (1) promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation. *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010). Defendant-supervisors may be liable under § 1983 where an "affirmative" link exists between the unconstitutional acts by their subordinates and their adoption of a plan or policy, express or otherwise, showing their authorization or approval of such misconduct. *Id.* at 1200–01; *Cox v. Glanz*, 800 F.3d 1231, 1248 (10th Cir. 2015). Hinshaw was never plaintiff's direct supervisor, therefore plaintiff's claims against Hinshaw mirror those against Sedgwick County. For the same reason plaintiff fails to show any policy makers in Sedgwick County acted with deliberate indifference to an excessive risk of sexual misconduct, plaintiff fails to show any link between Kendall's unconstitutional act and Hinshaw's adoption of a plan or policy, express or implied, authorizing or approving such misconduct. Plaintiff fails to show that there

---

[20] Hinshaw did not raise qualified immunity in his moving brief. Therefore, the court only looks to whether plaintiff can raise a genuine issue of material fact whether Hinshaw is liable under § 1983.

is a link between the training Kendall received and plaintiff's alleged injury.  Therefore, plaintiff's

§ 1983 claim against Hinshaw in his personal capacity fails.

### B.  Plaintiff's Negligence Claims Against Sedgwick County and Hinshaw

Count II of the pretrial order (Doc. 107) alleges a claim for negligence against each defendant

under the KCTA.  Plaintiff brings negligence claims against Sedgwick County and Hinshaw, alleging

as follows:

> Defendants departed from well-accepted, established standards in the field of
> corrections.  Defendants were therefore negligent and/or reckless, thereby entitling
> Kocsis to a judgment for actual damages against all defendants, exemplary damages
> against Kendall, and attorneys' fees.

(Doc. 107 at 19.)  Plaintiff alleges that defendants are liable for (1) Kendall's sexual assault and rape of

plaintiff and (2) their own negligence in allowing the rape to occur and failing to protect plaintiff.

### 1.  Sedgwick County's or Hinshaw's Liability Under the KTCA for Kendall's Sexually Assaulting Plaintiff

Plaintiff suggests that Sedgwick County or Hinshaw could be liable under the KTCA through

respondeat superior for the acts of Kendall.  Defendants argue that Kendall was acting outside of the

scope of his employment, and therefore, they cannot be held liable for his actions.  Plaintiff did not

respond to defendants' claim that Kendall acted outside the scope of his employment.

Under the KTCA, governmental entities "shall be liable for damages caused by the negligent or

wrongful act or omission of any of its employees while acting within the scope of their employment

under circumstances where the governmental entity, if a private person, would be liable under the laws

of this state."  Kan. Stat. Ann. § 75-6103(a).  Essential to a finding of liability, then, is that the

employee's underlying wrongful act must have been conducted in the scope of employment.

Under the KTCA, "to determine if an employee is acting within the scope of employment the

court considers: (1) whether the act by the employee was done for the employee's personal benefit or

in furtherance of the state's business; (2) whether there was express or implied authority to perform the act in question; and (3) whether the employee's act was reasonably foreseeable by the State." *Meyer v. Nava*, 518 F. Supp. 2d 1279, 1290 (D. Kan. 2007) (quoting *Commerce Bank of St. Joseph v. Kansas*, 833 P.2d 996, 1001 (Kan. 1992)).

First, the alleged sexual assault and rape were conducted for Kendall's own benefit and was not in furtherance of the state's business. Second, there was no express or implied authority for guards to sexually abuse inmates. Regarding the third factor, the focus of determining whether an act is in the scope of employment for purposes of the KTCA is to determine whether it was reasonably "foreseeable in performing duties furthering the employment." *Casas v. City of Overland Park*, No. CIV. A. 00-2112-CM, 2001 WL 584426, at *8 (D. Kan. May 14, 2001) (discussing and citing *Commerce Bank*, 833 P.2d at 997). Here, Kendall "stepped aside from the State's business and [did] an individual wrong." *Id.*; *cf. Healey v. Scovone*, No. 98-2285, 1999 WL 535298, at *3 (10th Cir. July 26, 1999) (finding that sexual assault was not authorized by the employer and was done for defendant's own personal interest). Because Kendall's act was outside of the scope of his employment, the KTCA does not apply to impart liability on the county for Kendall's actions.

## 2. Whether Sedgwick County or Hinshaw were Negligent

Plaintiff also suggests that Sedgwick County and Hinshaw individually are liable for departing from "well-accepted, established standards in the field of corrections." (Doc. 107 at 19.) Under Kansas law, to recover for negligence, plaintiff must establish the existence of a duty, a breach of that duty, an injury, and a causal connection between the breached duty and the injury. *McGee v. Chalfant*, 806 P.2d 980, 983 (Kan. 1991). Assuming defendants had a duty to plaintiff, plaintiff offers no evidence on the appropriate standard of care to determine whether the defendants breached their duty.

Plaintiff did not designate an expert on the standard of care here, and defendants argue that expert testimony is essential to plaintiff's claim.[21]   The court agrees.   The test to determine whether expert testimony is required under Kansas law to establish a standard of care is whether the subject matter is too complex to fall within the common knowledge of the jury and "is beyond the capability of a lay person to decide."   *Hare v. Wendler*, 949 P.2d 1141, 1148 (Kan. 1997).   Specifically, the question is whether the jury "would be able to understand, absent expert testimony, the nature of the standard of care required of defendant and the alleged deviation from the standard."   *Gaumer v. Rossville Truck & Tractor Co.*, 202 P.3d 81, 84 (Kan. Ct. App. 2009).

Under plaintiff's negligence theory, plaintiff questions (1) the adequacy of a surveillance system which transmitted images to viewers, but which did not record; (2) the adequacy of cameras which were incapable of following roving detention officers into inmate cells, which defendants state was necessary for privacy; (3) the adequacy of the Master Control system that did not alert supervisors when a roving deputy entered an inmate's cell; (4) whether it was necessary to include the words "zero tolerance" in written policy literature before the PREA regulations required it; and (5) whether the reporting system for inmates was adequate.   Plaintiff provides no evidence to establish the "well-accepted, established standards in the field of corrections" on jail administration for administering policy, surveillance and control systems, and reporting systems sufficient to prevent deputy sexual misconduct or rape of inmates.   The time for designating experts has passed, and plaintiff designated no experts to establish the standard of care.   Such expert testimony would be necessary to establish a

---

[21] Plaintiff did not designate an expert to testify on industry standards.   Defendants' experts apparently opine that defendants Sedgwick County and Hinshaw acted in compliance with industry standards. Plaintiff disclosed a "rebuttal expert," James Aiken, purportedly in response to defendants' expert disclosures, opining that defendants Sedgwick County and Hinshaw were not in compliance with industry standards.   Plaintiff did not present his expert's report in support of his response to defendants' motion for summary judgment, however.

standard under plaintiff's theory of negligence as it relates to defendants Sedgwick County and Hinshaw.   *See, e.g.*, *Cosio v. D.C.*, 940 A.2d 1009, 1012 (D.C. 2008) (listing cases explaining that expert testimony is necessary to show national standards of care of inmates in prison setting).   It is not common knowledge for people to know the standard of care regarding jail administration, particularly in these circumstances, where plaintiff's negligence theory relates to the adequacy of surveillance and control systems, reporting systems, and jail policy.

Finally, under these particular circumstances it appears that the bases for plaintiff's negligence claims are acts on the part of Sedgwick County and Hinshaw which fall under the discretionary exception to the KTCA.[22]   Under Kan. Stat. Ann. § 75-6104(e), government defendants are granted immunity for discretionary actions.   Specifically, the statute states as follows:

> A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from:
> . . .
> (e) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved[.]

Kan. Stat. Ann. § 75-6104(e).   Here, the decisions made by Hinshaw and others were whether to (1) change policy before it was legally required, (2) replace functional but non-recording cameras in the surveillance system, (3) update the surveillance system earlier with more cameras that would digitally record, and (4) update the control system to alert supervisors when roving deputies would enter an inmate's cell.   All of these decisions constitute discretionary acts under the KTCA.   Plaintiff refers to no specific legal duty in place at the time of the incidents to provide recording surveillance systems, alerting control systems, or explicit "zero tolerance" policies.   *See Soto v. City of Bonner Springs*, 238

---

[22] To the extent plaintiff's negligence theory relies on the acts of others, such as Evans for failing to notice Pitchford's claims, plaintiff has failed to properly raise the issues or show causation.

P.3d 278, 283–84 (Kan. 2010).  Even if there was fault or liability on the part of Hinshaw or Sedgwick County, those defendants are entitled to immunity under the KTCA.  Therefore, plaintiff's negligence claims fail, and the court grants defendants Hinshaw and Sedgwick County summary judgment on plaintiff's negligence claims.

**IT IS THEREFORE ORDERED** that defendants' Motion for Summary Judgment (Doc. 111) is hereby GRANTED.  All of plaintiff's claims against Sedgwick County and Robert Hinshaw are dismissed.  Plaintiff's claims against defendant David Kendall remain in the case.

Dated this 29th day of March, 2016 at Kansas City, Kansas.

s/ Carlos Murguia_____
**CARLOS MURGUIA**
**United States District Judge**